IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LORI SALTER, | ) | |
| | ) | CASE NO. 4:12-CV-888 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 15). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Lori Salter's ("Plaintiff" or "Salter") applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I. PROCEDURAL HISTORY

On June 30, 2008, Salter filed applications for Supplemental Security Income benefits and Disability Insurance benefits, alleging disability as of June 4, 2008. (Tr. 174, 177). The Social Security Administration denied her claims initially and upon reconsideration. (Tr. 85, 89, 97, 103).

Plaintiff filed a request for a review before an administrative law judge ("ALJ"). (Tr. 110).  ALJ James Pileggi convened an administrative hearing on December 4, 2009, to evaluate Plaintiff's applications. (Tr. 36-70).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), George Starosta, also appeared and testified. (*Id.*).  On December 23, 2009, Salter's counsel submitted a brief requesting to amend the allege onset date to December 22, 2006. (Tr. 151-66).

On June 10, 2010, the ALJ issued a decision, finding Plaintiff qualified for disability on March 6, 2009, but had not been disabled prior thereto. (Tr. 17-29).  After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work that existed in significant numbers in the national economy prior to March 6, 2009. (*Id*.).  A finding

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

   (1)    If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

   (2)    If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

   (3)    If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

   (4)    If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

   (5)    Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

of disability subsequent to March 6, 2009, was based on a framework of the Medical-Vocational rules, VE testimony, and Social Security Rulings 96-8p and 96-6p. (Tr. 28).  The Appeals Council denied Plaintiff's request for review for the portion of the ALJ's opinion that was unfavorable, making the ALJ's June 10, 2010, determination the final decision of the Commissioner. (Tr. 1-4).

Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on October 1, 1971, making her a "younger individual" for Social Security purposes. 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has past relevant work as a cashier, assembler, and school director. (Tr. 64-65).

### B.  Medical Evidence

#### 1.  Medical records prior to Plaintiff's alleged onset date

Plaintiff alleges that she became disabled on December 22, 2006, due to limitations arising out of multiple sclerosis ("MS") and associated symptoms. From January 1999 to December 2003, Plaintiff underwent medical treatment with Carl Ansevin, M.D., who diagnosed her with MS.

In January 2004, Plaintiff was seen by neurologist Francois Bethoux, M.D. (Tr. 367). After reviewing her medical history and MRI, the doctor confirmed that findings were consistent with MS. (Tr. 370). Plaintiff reported moderate fatigue due to change in her work shift, occasional imbalance, dragging of her foot intermittently, and clumsiness. (Tr. 367).  Upon physical examination, Salter's finger to nose and heel to shin touching was normal, her fine

movements were normal in both hands, her unstressed gait was normal, she was able to hop on either foot, she could walk ten steps with mild axial unsteadiness, and she did not require support for ambulation. (Tr. 369).  Dr. Bethoux recommended a course of IV steroids and Avonex. (Tr. 370, 377).  Plaintiff began this treatment later that January, and in July 2004 had a follow up with Dr. Bethoux. (Tr. 377).  Plaintiff's gait was normal and Dr. Bethoux commented that Plaintiff's examination was improved compared to her first visit. (Tr. 378).

In January 2005, Plaintiff underwent a brain MRI that showed extensive lesions with multiple black holes. (Tr. 381). Dr. Bethoux prescribed continued treatment with Avonex. (Tr. 381).  In June 2005, Plaintiff reported numbness in her hands and slightly blurred vision. (Tr. 383).  Her physical examination was stable and she continued the same course of medication. (Tr. 384).  On December 28, 2005, Plaintiff had a follow up appointment with Dr. Bethoux, where the doctor observed that her finger to nose touching was slightly off target, she had slight imbalance, and a stressed gait. (Tr. 386-87).

In May 2006, Plaintiff reported to Dr. Bethoux that her ability to walk had become worse and she required a cane for assistance. (Tr. 553).  Salter further indicated that she experienced severe paresthesias, could not pick up her feet, and had persistent numbness in her legs. (*Id.*). She was treated with IV steroids and her symptoms improved. (*Id.*). She met again with Dr. Bethoux in July 2006, and he noted that her physical examination was stable compared to last visit, and Plaintiff was back to her "baseline." (*Id.*). Her finger to nose touching was slightly off target on the right and she faltered after 2 to 3 steps tandem walking. (*Id.*).  An added treatment of IV steroids once every two months for three cycles was agreed upon. (*Id.*).

4

## 2.    Medical records following Plaintiff's alleged onset date

An MRI of Plaintiff's brain on December 26, 2006, showed an interval progression of findings compatible with central nervous system demyelination process. (Tr. 556).  During an appointment that day with Robert Fox, M.D., Salter reported that the numbness in part of her face, for which she was prescribed medication in November, had not improved. (Tr. 557-58). Plaintiff told Dr. Fox that she continued to limp, received IV steroids, and delayed her Avonex injections by a few days each week. (Tr. 557). More aggressive treatment options were discussed, but Plaintiff continued with Avonex. (Tr. 558).

In March 2007, Dr. Bethoux reported that Plaintiff was feeling better due to not working, her examination was stable, and she had an improved mood. (Tr. 563).  She could perform ten steps tandem with hesitancy and had no pain. (562-63). Plaintiff reported that she had stopped taking Avonex due to feeling depressed. (Tr. 563).  Dr. Bethoux advised a more aggressive approach to manage MS but Plaintiff refused; however, she agreed to resume Avonex and pulse IV steroids. (*Id.*).

Prior to her alleged onset date, Plaintiff initiated treatment with Russell Morrison, D.O., for problems with swelling, numbness and pain in her feet, numbness in the right hand and arm, and a crooked smile. (Tr. 585, 584, 391).  In May 2007, Dr. Morrison completed a "Physician's Report" describing his opinion of Plaintiff's physical limitations. (Tr. 567).  He reported that Plaintiff could stand or walk for two hours in an eight-hour workday; sit for five to eight hours in an eight-hour workday; occasionally lift up to ten pounds; reach above her shoulders, and use hands for repetitive grasping, pushing, pulling, and fine manipulation, but could not use feet for repetitive movements, as in operating foot controls. (*Id.*).  The doctor found that Salter could

occasionally bend, squat, crawl, climb, push, and pull. (*Id.*).  Dr. Morrison opined that during flare ups of MS, Plaintiff would have further limitations than stated. (*Id.*).

A few days later, Plaintiff was seen by Dr. Bethoux. (Tr. 627).  Salter explained that she had "readjusted" and felt less stress since stopping working, continued to swim as exercise, and was walking better. (*Id*). She had not restarted Avonex because of mood swings, but continued IV steroids. (*Id.*). After an updated brain MRI in July 2007 showed disease activity, and Dr. Bethoux explained that the IV steroids were not controlling her MS, Plaintiff agreed to restart Avonex. (Tr. 635).

In July 2007, state agency reviewing consultant Jon Starr, M.D, concluded that Plaintiff could lift and carry up to 20 pounds occasionally and up to ten pounds frequently; stand or walk about six hours total during an eight-hour workday; never climb ladders, ropes, or scaffolds or crawl; occasionally balance; and frequently climb ramps or stairs, stoop kneel, or crouch. (Tr. 614).  Dr. Starr opined that her condition had been stable until December 2006, when she developed Bell's Palsy, but those symptoms had resolved. (*Id.*).

In January 2008, Plaintiff had a follow-up with Dr. Bethoux, and she reported that she started Avonex in August, but developed flu-like symptoms and stopped taking it in October. (Tr. 637).  She did not receive IV steroids in December because her mother had a stroke, and she was busy caring for her. (*Id.*).  She had started teaching part-time as a teacher's aide, was going to yoga classes, and was doing well overall. (*Id.*).  After Dr. Bethoux discussed the importance of treating MS and strategies to minimize side effects, Plaintiff agreed to restart Avonex, as well as IV steroids. (Tr. 638).

Plaintiff had a follow up with Dr. Bethoux in June 2008, where she reported that she had not been taking Avonex regularly. (Tr. 640).  Upon physical examination, Dr. Bethoux found

6

that Plaintiff's upper extremity function on the right and left were within normal limits, though her finger to nose touching was slightly off target on the right. (Tr. 641). Plaintiff's lower extremities had no stiffness or spasticity. (*Id.*).  Salter was able to ambulate without assistance, perform heel and toe stressed gaits, and tandem walk ten steps hesitantly. (*Id.*).  However, Dr. Bethoux concluded the report by writing that "exam shows persistent ataxia, imbalance, and cognitive problems. (Tr. 641).

From June 2006 through July 2008, Plaintiff received skilled nursing home health care visits during which she received Solu-Medrol through an IV for 30 to 60 minutes per day for three days, every two to three months.  Salter's May 2008 discharge summary stated that it was difficult and taxing for Plaintiff to leave the home, she had an unsteady gait/balance, was well-groomed, and was forgetful. (Tr. 705).  Plaintiff's physical examination was within normal limits; she was able to dress and feed herself, manage her personal hygiene, drive independently, and perform housekeeping tasks. (Tr. 709-10).

In September 2008, state agency medical consultant W. Jerry McCloud, M.D., conducted a review of the updated medical record and opined that Plaintiff could lift and carry up to 20 pounds occasionally and up to ten pounds frequently; stand or walk for six hours during an eight-hour workday; sit for six hours in an eight-hour workday; occasionally stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds. (Tr. 669-70).

Plaintiff treated with neurologist Adreinne Boissy, M.D., in January 2009. (Tr. 680).  Salter had not been taking Avonex regularly because it made her feel sick, and her nurse thought her walking was getting worse. (*Id.*).  She denied any new neurological symptoms, but felt somewhat disoriented and unorganized. (*Id.*).  Upon physical examination, Dr. Boissy noted that Plaintiff was well-appearing, with facial strength and sensation intact, her right and left upper

7

extremity functions were within normal limits, her finger-to-nose test was slightly off target on the right, her lower extremity hip flexor strength was "5/5" on both sides, and there was no lower extremity stiffness/spasticity on either the right nor the left side. Plaintiff ambulated independently, could perform with both heel and toe stressed gaits, and could perform ten steps hesitantly with tandem gait. (Tr. 681).  Plaintiff decided to remain off of therapy.  (*Id.*).

In March 2009, Plaintiff underwent a physical therapy functional capacities evaluation performed by Matthew Sutliff, P.T. (Tr. 686). Plaintiff reported problems with thinking, forgetting things, coordination, walking, and fatigue. (*Id.*).   Upon physical examination, Plaintiff's strength in all joints was normal. (Tr. 688).  Salter had a "mildly antalgic gait with slight deviation off path." (Tr. 689).   Sutliff opined that Plaintiff displayed significant and persistent disturbance of gross and dexterous movements or gait and station. (Tr. 691).

In April 2009, Dr. Boissy completed a residual functional capacity evaluation of Plaintiff for the time period of June 4, 2008, to the present. (Tr. 694-97). Dr. Boissy identified the following symptoms: fatigue, difficulty remembering and solving problems, weakness, emotional liability, unstable walking, and problems with judgment and balance. (Tr. 694). The physician opined that Salter was capable of low stress jobs. (Tr. 694-95). Dr. Boissy recommended that Plaintiff avoid concentrated exposure to wetness and humidity, as well as moderate exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 697).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since the amended alleged onset date of December 22, 2006.

8

3.  Since the amended alleged onset date of disability, December 22, 2006, the claimant has had the following severe impairments: multiple sclerosis and depression.  Beginning on the established onset date of disability, March 9, 2009, the claimant has had the following severe impairments: multiple sclerosis and depression.

4.  Since the amended alleged onset date of disability, December 22, 2006, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that prior to March 6, 2009, the date the claimant became disabled, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant must be afforded a sit-stand option, she must avoid climbing, balancing on heights, crawling, kneeling, and squatting, as well as the operation of foot controls, and she is limited to occupations that are simple and repetitive in nature and require no more than routine work processes and settings.

6.  After careful consideration of the entire record, the undersigned finds that beginning on March 6, 2009, the date the claimant became disabled, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant must be afforded a sit-stand option, she must avoid climbing, balancing on heights, crawling, kneeling, and squatting, as well as the operation of foot controls, she is limited to occupations that are simple and repetitive in nature and require no more than routine work processes and settings, and she would require breaks and absences at will with time off work tasks in excess of customary industry allowances.

7.  Since December 22, 2006, the claimant has been unable to perform any past relevant work.

8.  Prior to the established disability onset date, the claimant was a younger individual age 18 to 44.  The claimant's age category has not changed since the established disability onset date.

9.  The claimant has at least a high school education and is able to communicate in English.

    . . .

11. Prior to March 6, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

12. Beginning on March 6, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

13. The claimant was not disabled prior to March 6, 2009, but became disabled on that date and has continued to be disabled through the date of this decision.

(Tr. 19-29) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

10

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

### A. Whether the ALJ erred in analyzing Dr. Boissy's opinion

Plaintiff first argues that "Dr. Boissy was a treating source and that the ALJ was bound by the treating source rule when evaluating her opinion." (Doc. No. 29). Dr. Boissy was a neurologist who had telephone contact with Plaintiff on one occasion in October, November, and December 2008. (Tr. 694). The physician treated Plaintiff on one occasion in January 2009, before completing a Multiple Sclerosis Residual Functional Capacity form in April 2009. (Tr. 694-97). The only functional limitations that the doctor identified were that Plaintiff was capable of low stress jobs and that she must avoid exposure to certain environmental restrictions. (Tr. 695, 697).

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating source. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The treating source doctrine recognizes that physicians who have a long-standing treating relationship with an individual are better equipped to provide a complete picture of the individual's health and

treatment history. *Id.*; 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). Under the Social Security Regulations, opinions from such physicians are entitled to controlling weight if the opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

A physician may be deemed a "treating source" if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (alteration in original) (*quoting* 20 C.F.R. § 404.1502). While a physician seen infrequently may be a treating source, such a finding is only appropriate "if the nature and frequency of the treatment or evaluation is typical for [the] condition." *Id.* "The question is whether [the claimant] had the ongoing relationship with [the physician] to qualify as a treating physician at the time he rendered his opinion." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006).

Plaintiff argues that because Dr. Boissy is a board-certified neurologist, who worked with one of her treating physicians, and "presumably had access" to her medical records before ordering a functional capacity evaluation and issuing her opinion, she should be considered a treating physician.

Even if Dr. Boissy did reviewed Plaintiff's medical records prior to issuing her opinion, the physician did not examine or treat Plaintiff with the frequency required to qualify as a treating source. Plaintiff spoke over the phone with Dr. Boissy three times, but the physician treated Plaintiff in person on only one occasion before opining as to Plaintiff's functional limitations. The deference afforded to treating physicians is based on the assumption that "a medical professional who has dealt with a claimant and his maladies over a long period of time

will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (*citing Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983)).  Given the nature and prolonged course of Plaintiff's difficulties with MS, phone contact, coupled with a single examination, is not sufficient to render Dr. Boissy a treating physician. Accordingly, the Court concludes the treatment relationship was not such that Dr. Boissy was a treating source.

Plaintiff maintains that even if Dr. Boissy was not entitled to controlling weight as a treating source, the ALJ was still required to indicate what weight was afforded to the neurologist's opinion. Additionally, Plaintiff argues that the ALJ erred in failing to incorporate the doctor's suggestion that Salter avoid exposure certain hazards in the RFC without explaining why these limitations were rejected.

It is well-established that for an ALJ's decision to stand, the ALJ is not required to discuss every piece of evidence in the record. *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  Nevertheless, if the opinion of a medical source contradicts the RFC finding, an ALJ must explain why he did not include its limitations in the determination of the RFC. *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p explains, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

13

In his opinion, the ALJ does not expressly state the weight assigned to Dr. Boissy's opinion. Nor does he discuss the physician's limitations regarding avoidance of certain environmental restrictions. Despite this lack of clarity, the Court finds that any error that may exist involving the doctor is harmless.

The Sixth Circuit has held that where an ALJ's decision is otherwise supported by substantial evidence, the failure to mention a consultative, non-treating source may constitute reversible error. *See Dykes v. Barnhart*, 112 F. App'x 463, 467-69 (6th Cir. 2004) (failure to expressly reject portion of consultative examiner's opinion was harmless error). The *Dykes* court concluded that the ALJ's failure to explicitly reject a consultative examiner's assessment constituted harmless error because the ALJ's decision was otherwise supported by substantial evidence. *Id.* at 468 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-36 (6th Cir. 2001)).

Here, the ALJ did not ignore Dr. Boissy's treatment notes or the doctor's medical source statement. Rather the ALJ discussed medical records from Plaintiff's single in-person treatment session with Dr. Boissy, as well as the physician's residual functional capacity form, demonstrating that he accounted for the physician's opinions when formulating the RFC. (Tr. 23). Although the ALJ did not designate the weight attributed to Dr. Boissy, the ALJ sufficiently considered the physician's opinion and communicated that he gave it at least some weight. In his discussion of the medical evidence, ALJ acknowledged and agreed with Dr. Boissy's conclusion that Plaintiff was capable of performing low stress jobs, despite her allegations of disabling symptoms. (Tr. 23).

Additionally, Plaintiff correctly asserts that the ALJ failed to expressly address Dr. Boissy's environmental restrictions and did not incorporate these limitations into the RFC.

14

Nevertheless, the jobs that the VE identified that Plaintiff could perform at step five of the sequential analysis do not require exposure to the types of hazards that Dr. Boissy prohibited (moderate exposure to extreme cold, heat, pulmonary irritants, and hazards as well as concentrated exposure to wetness and humidity).  These jobs were a surveillance systems monitor (DOT # 379.367-010), a call-out operator (DOT # 237.367-014), and a telephone information clerk (DOT # 237.367-046).  Accordingly, even if the ALJ had incorporated these restrictions into the RFC, Plaintiff would not have been entitled to benefits.  Given that the jobs identified do not conflict with the doctor's recommendation, to remand for the ALJ to provide further explanation would be futile.  *See Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").  Plaintiff has not demonstrated that she was otherwise prejudiced by the ALJ's analysis of Dr. Boissy's opinion. Accordingly, Salter's assignment of error is not well taken.

### B.  The ALJ's Step Three Finding

Plaintiff also claims the ALJ erred at step three of the sequential analysis by failing to consider whether her severe physical impairments met or medically equaled Listing 11.09, the listing for multiple sclerosis.  Specifically, Plaintiff argues that evidence in the record demonstrates that she satisfies the requirements of Listing 11.09(A), and the ALJ erred in failing to specifically analyze the Listing and relevant medical evidence in denying her application.

The third step of the disability evaluation process asks the ALJ to compare the claimant's impairments with an enumerated list of medical conditions found in the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  Each

listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  A claimant will be deemed disabled if his impairments meet or equal one of these listings.  In order to "meet" a listing, the claimant must satisfy all of the listing's requirements. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009).  However, if the claimant does not meet all of the listing's requirements, he may still be deemed disabled if his impairments "medically equal" the listing in question. 20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3).  To do so, the claimant must show that his impairments are "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(b)(3).  At this step, it is the claimant's burden to provide evidence showing that she equals or meets the listing.  *Retka v. Comm'r of Soc. Sec.*, No. 94-2013, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) (*citing Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).

Social Security Listing 11.09(A) requires "[d]isorganization of motor function as described in 11.04B (i.e., significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station)." 20 C.F.R. Pt. 404, Subpt. 404, App. 1, 11.09.  Listing 11.04(B) also refers to Listing 11.00(C). 20 C.F.R. Pt. 404, App. 1, 11.04.  Listing 11.00(C) details the nature of the disorganization of motor function required by the Listings:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. Pt. 404, Subpt. 404, App. 1, 11.00(C).

Here, the ALJ found that Plaintiff's MS qualified as a severe impairment at step two of the sequential evaluation. (Tr. 19). The ALJ went on to provide the following analysis at step three:

> [T]he medical evidence of record does not contain objective signs, symptoms, or findings, nor the degree of functional restriction necessary for the claimant's impairments, considered singly or in combination, to meet or medically equal in severity any section of the aforesaid Listings. (Exhibits 1F-27F; and, see Discussion of the Medical Evidence at Finding No. 5 *infra*.). The Administrative Law Judge notes that the State agency consultants, who have reviewed the record and are acceptable medical sources, also find that the claimant's impairments, considered either singly or in combination, do not meet or medically equal in severity any section of the Listings of Impairments. (Exhibits 9F, 15F, 16F, 18F).

(Tr. 20-21).

Plaintiff relies on *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411(6th Cir. 2011), in support of her argument that the ALJ committed reversible error in failing to discuss Listing 11.09(A) by name and to state why she did not meet its requirements. In *Reynolds* the ALJ concluded that the claimant's impairments did not satisfy the criteria for any listing in Section 1.00 or Section 12.00. *Id.* at 416. The ALJ discussed in detail why the claimant did not meet the criteria for Listing 12.04, but did not address any specific listing in Section 1.00, essentially "skipping an entire portion of the analysis." *Id.* The Sixth Circuit explained that the ALJ's failure to provide this discussion deprived the court of the ability to conduct a meaningful review of the disability determination:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* Additionally, in remanding for a lack of analysis, the *Reynolds* Court emphasized that it was "possible that the evidence [the claimant] put forth could meet" the listing at issue, so the harmless error rule did not apply. *Id.*

17

In the present case, the ALJ's discussion at step three does not address with specificity medical evidence that relates to Listing 11.09(A). (Tr. 20). The ALJ instead incorporated by reference the discussion of medical evidence provided in the residual functional capacity analysis to support the listing determination. (*Id.*). The ALJ also signaled his reliance on the opinions of state agency consultants who found that Plaintiff's impairments did not meet or medically equal any listing. (Tr. 20-21).

While the ALJ did not provide a thorough analysis at step three, the ALJ set out a sufficient discussion of medical evidence relevant to the issue of Plaintiff's motor function disorganization during his analysis at step four to satisfy his obligations. There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (*quoting Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). Courts may look to the ALJ's decision in its entirety to justify the ALJ's step three analysis. *Id.*

Here, the ALJ's discussion at step four is such that the Court can reasonably conclude that during the period at issue, Plaintiff's MS was insufficient to satisfy the criteria of Listing 11.09(A), which requires significant and persistent disorganization of motor function in two extremities. For example, the ALJ highlighted the following evidence:

- In Plaintiff's March 2008 session with Dr. Morrison, the doctor assessed that Plaintiff was intact neurologically. (Tr. 21, 701).

- From June 2007 through May 2008 Plaintiff received skilled nursing home care. She experienced problems with endurance and ambulation at the beginning; however, her discharge summary showed that her physical examination was within normal limits. (Tr. 22, 812-17).

- A physical examination from Plaintiff's June 2008 session with Dr. Bethoux showed ataxia and imbalance. (Tr. 21, 641). However, Plaintiff had not been taking Avonex regularly, she rated her pain at "0" out of "10," her upper extremity function was within normal limits, and her lower extremity strength was "5/5." (*Id.*). Additionally,

18

progress notes from Dr. Bethoux show that over time, on numerous occasions, Salter was doing well and her examinations were relatively stable. (Tr. 22, 563, 628, 635, 638, 642).

- At Plaintiff's January 2009 office visit with Dr. Boissy, Plaintiff's upper and lower extremity functioning was within normal limits, Plaintiff could ambulate independently, and she could heel-toe walk. (Tr. 23, 681).

Overall, the ALJ's step 4 analysis sufficiently demonstrates that Plaintiff's MS did not satisfy the criteria of Listing 11.09(A) during the period which she purports she was disabled.

Although the ALJ must explain his step three finding, the claimant bears the burden of proving she meets a Listed Impairment at step three. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). Consistent with this principle, the Sixth Circuit has held that remand is only appropriate when the record raises a "substantial question" over whether a claimant meets a listing. *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641-42 (6th Cir. 2013) (*citing Abbot v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).

In her brief, Plaintiff describes a range of medical and other evidence that she asserts creates a substantial question. However, a significant portion of the evidence Plaintiff highlights is before her alleged period of disability began in December 2006. Plaintiff must demonstrate the existence of objective medical findings that would meet or medically equal the listing during the relevant period. *Grier v. Comm'r of Soc. Sec.*, No. 1:12-CV-02118, 2013 WL 3934176, at *6 (N.D. Ohio July 30, 2013).

Even taking into account the evidence that Plaintiff highlights prior to the relevant period, she does not meet her burden at this stage. Of the evidence Plaintiff sets out in her brief that is relevant to the requirements of the listing, much consists of self-reported symptoms, rather than objective medical findings. For instance, Plaintiff points to her January 2004 self-report of parasthesias from the waist down, occasional imbalance, and dragging the left foot

intermittently. (Tr. 367-68).  However, on physical examination, Salter's motor function and strength in all extremities was normal, her gait was normal, and she was able to walk on toes and heels. (Tr. 369).  Again, on July 9, 2004, despite Plaintiff's subjective complaint of a disturbed gait with occasional dragging of the left foot, her physical examination showed a normal gait without support and only mild axial unsteadiness. (Tr. 377-78).  In July 2006, Plaintiff's finger to nose test was slightly off target on the right side, and she could perform tandem walking for two to three steps before faltering. (Tr. 553-54).  However, her physician noted that Plaintiff had experienced an exacerbation at the end of May and her symptoms resolved with steroid treatment. (Tr. 554).  Notably, in his opinion, the ALJ cites to progress notes from Dr. Bethoux from July 2004 to July 2006, which reflected that Salter was doing well, her physical examinations were relatively stable, and her gait was normal. (Tr. 22, 377-78, 381, 384, 553-54).

As to evidence from the relevant period, Plaintiff points to the results of a June 2008 examination with Dr. Bethoux that showed ataxia and imbalance. (Tr. 641). The ALJ specifically addressed this examination and acknowledged this finding. (Tr. 21).  Nevertheless, the ALJ explained that the examination also showed that Plaintiff was not consistently taking Avonex and her lower extremity strength was "5/5." (Tr. 21-22, 641).  The examination further indicated there was no lower extremity stiffness or spasticity in either the left or right leg. (Tr. 641). Salter could perform heel and toe walking and walk 10 steps tandem gait. (*Id.*).

Plaintiff also points to findings from a physical therapy examination performed on March 6, 2009. (Tr. 686-91).  The Court notes that this examination was performed on the day that the ALJ determined Plaintiff was disabled. The report shows that Salter was able to ambulate independently, with only a "mildly antalgic gait with slight deviation off path." (Tr. 680).  This evidence is not sufficient create a substantial question with regard to the listing.  In relation to the

Listing, the physical therapist opined that Plaintiff suffered from "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait and station." (Tr. 691).  Even so, Sutliff is a physical therapist, which is categorized by the regulations as a medical source that is not an "acceptable medical source." 20 C.F.R. §§ 404.1513(a), 416.913(a) (listing "acceptable medical sources" and not including "physical therapists" on that list).  Physical therapists cannot establish the existence of a medically determinable impairment. S.S.R. 06-03p, 2006 WL 2263437 (2006).  An ALJ can consider their opinions for information regarding the severity and effects of impairment. *Id.*  As a result, Sutliff's assessment as to whether Plaintiff met the listing is insufficient because such an opinion requires the expertise of a medical source, not a physical therapist.

### C.  Plaintiff's Credibility

Salter argues that the ALJ failed to properly evaluate her credibility in light of her MS. Generally, "[a]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Notwithstanding, the ALJ's credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the ALJ is "not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (*quoting* S.S.R. 96-7p, 1996 WL 374186, at *4).

The Sixth Circuit follows a two-step process in the evaluation of a claimant's subjective complaints of disabling pain. 20 C.F.R. §§ 404.1529, 416.929; *Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).  First, the ALJ must determine whether the claimant has an underlying

medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. *Rogers*, 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms on the claimant's ability to work. *Id.*  The ALJ should consider the following factors in evaluating the claimant's symptoms: the claimant's daily activities; the location, duration, frequency and intensity of the claimant's symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve the pain; measures used by the claimant to relieve the symptoms; and statements from the claimant and the claimant's treating and examining physicians. *Id.*; *see Felisky*, 35 F.3d at 1039-40; S.S.R. 96-7p.

In the present case, Plaintiff argues that the ALJ's credibility analysis is flawed, because it in, the ALJ failed to acknowledge that MS is a disease characterized by periods of exacerbation and remission. Plaintiff asserts that the ALJ recounted in the opinion that her condition improved at times, but failed to discuss whether improvements occurred during periods of remission or discuss evidence showing that, at other times, her condition deteriorated.  In support of her argument, Plaintiff cites to the following portion of *Parish v. Califano*:

> Multiple sclerosis is an incurable, progressive disease subject to periods of remission and exacerbation. Because the . . . period wherein plaintiff attempted to work and attend school was unquestionably a period of remission, we believe the ALJ erred in placing undue reliance on this brief and temporary interruption of plaintiff's progressively disabling condition. Rather, he should have considered that time-span as merely a period of remission in a continuing disability in making this finding.

642 F.2d 188, 193 (6th Cir. 1981).  Plaintiff also highlights *Wilcox v. Sullivan*, where the Sixth Circuit explained that "in evaluating multiple sclerosis, or any other episodic disease, consideration should be given to the frequency and duration of the exacerbations, the length of

the remissions, and the evidence of permanent disabilities." 917 F.2d 272, 277 (6th Cir. 1990). Both of these cases focus on how the ALJ should view MS when conducting the functional capacity analysis.

Here, the ALJ could have provided a more explicit analysis regarding periods of improvement and exacerbation as characteristic of MS. Even so, the ALJ's opinion shows that he was aware of Plaintiff's MS and provided a discussion of the medical evidence that acknowledged moments of improvement and decline in Plaintiff's health. (Tr. 21-23). For example, the ALJ noted that at the beginning of nursing home care in June 2007, Plaintiff had problems with endurance and ambulation. (Tr. 22). The ALJ also wrote that Plaintiff's December 2006 MRI showed an increased number of lesions, but physically she did not appear of have demonstrated a worsening of her condition, as she was able to ambulate independently and had good function of bilateral upper extremities. (Tr. 22).

More importantly, the ALJ did not ground the credibility determination solely, if at all, on periods of disease remission. Instead, the ALJ gave a number of independent good reasons to call into question Plaintiff's credibility, which Plaintiff does not now contest. For instance, the ALJ noted that Salter was not always compliant with taking medication for her MS and underwent only conservative treatment for the disease. (Tr. 23). The ALJ also highlighted medical evidence from medical sources that undermined Plaintiff's allegations. Dr. Morrison as well as the state agency physicians found that Plaintiff was capable of performing a reduced range of light work. (*Id.*). In terms of daily activities, the ALJ described a range of activities Plaintiff performs, including: managing personal hygiene, cooking simple meals, cleaning, laundry, ironing, dishes, minor household repairs, operating a motor vehicle, attending church regularly, participating in the church choir, and going out to eat or to the movies with friends.

(Tr. 23, 287-91).  Accordingly, the ALJ provided reasonable grounds, supported by the record in support of the credibility determination such that remand is not appropriate.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.   Accordingly, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  April 24, 2015.